

Eastern District of Kentucky
**F I L E D**

MAY 2 3 2014

AT LEXINGTON
ROBERT R. CARR
CLERK U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
AT LEXINGTON

| | |
|---|---|
| NORFOLK COUNTY RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated, | CIVIL ACTION NO. 5:12-CV-195-KKC |
| **Plaintiffs,** | |
| V. | **MEMORANDUM OPINION** |
| TEMPUR-PEDIC INTERNATIONAL, INC., MARK A SARVARY, and DALE E. WILLIAMS, | |
| **Defendants.** | |

\*\*\* \*\*\* \*\*\*

In an Order issued March 31, 2014 (DE 115) this Court granted Defendants' motion to dismiss (DE 91), denied as moot Defendants' motion for a hearing (DE 92), and denied as futile Plaintiff's motion to file an amended complaint (DE 97). This memorandum opinion will explain that Order.

## I. BACKGROUND

Plaintiff Norfolk County Retirement System represents a class of investors (the "class") who acquired publicly-traded common stock of Tempur-Pedic ("TPX") between January 25, 2012 and June 5, 2012. (DE 87, p. 1). TPX manufactures and distributes premium mattresses, pillows, and related viscoelastic products and maintains a market in North America and internationally. (DE 87, p. 13). Defendant Mark Sarvary is the Chief Executive Officer of TPX and a member of TPX's board of directors. (DE 87, p.3). Defendant Dale E. Williams is the Executive Vice President and Chief Financial Officer of

TPX. (DE 87, p. 10). The Court will refer to Sarvary and Williams together as the "individual defendants."

During 2011, TPX experienced record sales, (DE 96, p. 1) and entering 2011, TPX "was the unquestioned market leader in specialty premium" mattresses. (DE 96, p. 5). In April 2011, Serta, one of TPX's competitors, launched its line of iComfort mattresses, which like TPX products, were non-spring, viscoelastic mattresses. (DE 87, p. 16). According to a confidential witness referred to in the complaint, in August of 2011, Sarvary, Williams, and other TPX executives attended a tradeshow, where Sarvary and other executives attended a meeting and learned that four of TPX's top ten retailers would begin carrying the iComfort beginning in January of 2012.[1] (DE 87, p. 18). The confidential witness also stated that TPX executives directed territorial sales managers to compile their sales data into an excel spreadsheet comparing sales figures prior to the introduction of the iComfort and TPX sales after the release of the iComfort. (DE 87, p.18). This information was compiled into a PowerPoint presentation entitled "iComfort Risk Analysis for Mark [Sarvary] Meeting Sept [20]11." (DE 87, p. 18–19). The report indicated that sales of TPX in retailers that were also carrying iComfort grew only 3% on average; whereas at retailers not carrying iComfort, TPX sales increased by an average of 33%. (DE 87, p. 19). The complaint states, "by September 2011, Sarvary . . . and other Tempur-Pedic executives would have known [about] . . . the 'TPX 2011 iComfort Risk Analysis' [Report], [and] that iComfort was materially impacting the Company's sales growth by an implied 30% at retailers who had begun selling the iComfort." (DE 87, p. 19).

---

[1] The complaint does not allege that Williams actually attended the meeting where the executives learned that iComfort was expanding to four of ten of its major retailers.

As further proof that TPX executives had knowledge of the new Serta competition, the class refers to "Top 30 reports," which, according to the complaint, were compilations of the sales results in TPX's top thirty retail accounts. (DE 87, p. 19–20). The class alleges that these reports were sent by email to defendant Sarvary. (DE 87, p. 19–20). However, it is unclear how these weekly reports would reveal anything about the iComfort or its impact on sales. The class also offers a number of statements from three other confidential witnesses, ranging from reports of declining sales in territories where iComfort had been introduced to reports of TPX warehouse meetings where TPX employees or executives indicated that the excess inventory at the warehouse was due to the competition. (DE 87, p. 21–24). The complaint also alleges that seven weeks in advance of the first "corrective disclosure," "Defendants Sarvary and Williams exercised a total of 85,000 stock options and sold those shares at a higher price for . . . [a] gain . . . of over $5.7 million." (De 87, p 25).

The complaint then asserts that Sarvary and Williams made a series of "false and misleading statements." (DE 87, p. 25). The statements were made during the following events: a January 24, 2012 press release, a January 24, 2012 conference call, a January 30, 2012 fiscal year 2011 form 10-K, a February 22, 2012 webcast, a March 5, 2012 conference, an April 19, 2012 conference call, and a 1Q 2012 Form 10-Q. (DE 87, p. 25–49). In a series of press releases beginning on April 19th and continuing to June 6, 2012, TPX began lowering the company's expectations and projections for the year due to increased North American competition. (DE 87, p. 48–49). As a result, TPX's share price dropped dramatically. (DE 87, p. 49).

In Counts 1 and 2 of the complaint, the class asserts violations of Section 10(b) of the Securities Exchange Act of 1934 ("Securities Act") and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") against TPX and against the

3

individual defendants. (DE 87, p. 69–73). In Count 3, the class also asserts a cause of action for violation of Section 20(a) of the Securities Act against the individual defendants. (DE 87, p. 73). At the root of the complaint, the class asserts that TPX and the individual defendants violated Section 10(b) of the Securities Act when they made certain statements and positive growth projections, while knowing or being reckless in not knowing that the introduction and expansion of the iComfort was and would continue to encroach on TPX's market share.

## II. STANDARD OF REVIEW

When considering a Fed. R. Civ. P. 12(b)(6) motion to dismiss, the Court must regard the "factual allegations in the complaint . . . as true." *Scheid v. Fanny Farms Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988) (quoting *Windsor v. The Tennessean*, 719 F.2d 155, 158 (6th Cir. 1983)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To survive a motion to dismiss, a plaintiff's factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Id.* The plaintiff must plead "enough facts to state a claim to relief that is plausible on its face" and to nudge his claim "across the line from conceivable to plausible." *Id.* at 570. "[A] complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (citing *Twombly*, 550 U.S. at 562).

The Private Securities Litigation Reform Act of 1995 ("PSLRA") creates pleading requirements in securities fraud cases that are more rigorous than general pleading

4

standards. *Campbell v. Lexmark Intern. Inc.*, 234 F. Supp. 2d 680, 682 (E.D. Ky. 2002). The purpose of the PSLRA's heightened requirements is to protect companies from frivolous securities lawsuits. *See id.* Further, unlike in a general case on a motion to dismiss, "a court can consider the full texts of SEC filings, prospectuses, analysts' reports and other documents referenced in the complaint, regardless of whether they are attached in part or whole." *Albert Fadem Trust v. Am. Elec. Power Co., Inc.*, 334 F. Supp. 2d 985, 995 (S.D. Ohio 2004).

Finally, in relation to scienter, the PLSRA's heightened pleading standard is as follows:

> [i]n any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(2)(A). This standard does not alter the level of scienter (i.e. knowledge or recklessness) that a plaintiff must ultimately *prove* to prevail in a securities fraud case, but does change the *pleading* standard he must meet to survive a motion to dismiss. *In re Humana, Inc. Sec. Litig.*, No. 3:08CV-00162-JHM, 2009 WL 1767193 at *7 (W.D. Ky. June 23, 2009) (citing *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 682 (6th Cir. 2004)). "Therefore, if a plaintiff does not plead with particularity facts giving rise to a *strong inference of scienter*, i.e. knowledge or recklessness, a court may, on any defendant's motion, dismiss the complaint." *Id.* (emphasis added) (internal citations omitted).

## III. ANALYSIS

### A. SECTION 10(b) OF THE SECURITIES EXCHANGE ACT

The class asserts a claim against TPX and the individual defendants under the "anti-fraud provision, § 10(b), of the Securities Act, 15 U.S.C. § 78j(b). In relevant part, it provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. §78j(b).

The SEC regulation promulgated under § 10(b) provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. "The basic elements of a cause of action under the anti-fraud provision are "(1) *a material misrepresentation* or omission; (2) *scienter*; (3) a connection with the purchase or sale of a security; (4) reliance (or transaction causation); (5) economic loss; and (6) loss causation," *Humana*, No. 3:08CV-00162-JMH, 2009 WL 1767193 at *7 (emphasis added) (citing *Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 917 (6th Cir.

2007)). The only issue in the present motion is whether the class has adequately pleaded (1) a material misrepresentation or omission and (2) scienter.

### i. Material Misrepresentation

There are two components in the first element of an actionable claim under Section 10(b)/Rule 10b-5. A statement must be (1) material and (2) a misrepresentation or omission. TPX and the individual defendants insist that the majority of the statements at issue fail as they are either not material or not misrepresentations. The Court agrees.

As the Court of Appeals has explained regarding materiality,

> [a] misrepresentation or an omission is *material* only if there is a *substantial likelihood* that a reasonable investor would have viewed the misrepresentation or omission as having *significantly* altered the total mix of information made available. . . . . *We may properly dismiss a complaint on the ground that the alleged misrepresentations or omissions are immaterial only if they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance.* Immaterial statements include *vague, soft, puffing* statements or obvious *hyperbole upon which a reasonable investor would not rely.* Statements that are "mere puffing" or "corporate optimism" may be forward-looking or *"generalized statements of optimism* that are not capable of objective verification."

*In re Ford Motor Co. Sec. Litigation, Class Action*, 381 F.3d 563, 570 (6th Cir. 2004) (emphasis added) (internal citations omitted). "Courts everywhere have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace – loosely optimistic statements that are so vague, so lacking in specificity or so clearly constitute the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." *Id.* at 570–71; *City of Monroe Emp.*

7

*Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 669 (6th Cir. 2005). In short, dismissal is appropriate when the allegedly misleading statements are general or vague or are opinions made by the corporation and its executives while wearing rose-colored glasses. Put another way, statements that are so general and void of any substantive content and that fail to communicate anything that would alter the total mix of information are not material; "empty statements [are] immaterial as a matter of law." *Plumbers and Pipefitters Local Union No. 630 Pension Annuity Trust Fund v. Allscripts-Misys Healthcare Solutions, Inc.*, 778 F. Supp. 2d 858, 872 (N.D. Ill. 2011).

In this case, many of the statements referenced in the class's complaint are not material as a matter of law. The statements are either so vague as not to alter the total mix of information or so generally optimistic that they lack substantive content and do not communicate much at all. For example, on March 5, 2012 at a Raymond James International Institutional Investors Conference, Defendant Williams said, "Just a phenomenal year for the Company, very pleased with the kind of performance and we look for that kind of growth opportunity to continue into the long-term future." (DE 91-7, p.3). What constitutes a "phenomenal year"? How can an investor objectively verify whether the company is *looking* for "growth opportunity" in the future? A reasonable investor simply would not find such statements "important to the total mix of information available." *Ford*, 381 F.3d at 570–71. The class also argues that the statement "We continue to see good – a long runway of opportunity continuing to improve gross margins in the business" is misleading. (DE 87, p. 35). Yet, it is so vaguely optimistic it almost says nothing at all. Taking many of the statements in question in context, it is clear that they are "too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision." *Monroe*, 399 F.3d at 671. The

8

list in Part III. B of this opinion provides a full account of all of the statements at issue in this matter; many of the statements in whole or in part are clearly immaterial as a matter of law, as "no reasonable investor could find them important to the total mix of information available." *Ford*, 381 F.3d at 571.

Even if a statement is a material, a plaintiff must plead facts that demonstrate that the material statement is misleading in order for it to be considered a misrepresentation. The PSLRA provides heightened pleading requirements in certain securities cases to help prevent "strike suits" that are filed simply because a company's stock price drop. *See Miller v. Champion Enter., Inc.*, 346 F.3d 660, 690 (6th Cir. 2003). "Adding to the Federal Rules of Civil Procedure 9(b) requirement that fraud must be stated with particularity, the PSLRA mandates that" when a plaintiff alleges that there is an untrue or misleading statement, the plaintiff must "specify each statement alleged to have been misleading, *the reason or reasons why the statement is misleading*, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed." *Ford*, 381 F.3d at 569 (emphasis added). Thus, a plaintiff must provide facts to support its allegation that a statement was false or misleading. *Humana*, No. 3:08CV-00162-JHM, 2009 WL 1767193 at*16 (dismissing a similar claim as the instant case, in part because plaintiff failed to plead facts to support its allegation that certain statements were false or misleading).

Statements that are literally true can mislead investors. *Plumbers*, 778 F. Supp. 2d at 878. The Court must ask "whether the facts alleged [including in the context the statements are made] are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Id.* Statements, taken in context, that are merely

9

accurate statements of historical facts and describe other facts not challenged as untrue are not misrepresentations. *See id.*

Finally, "[t]he disclosure of accurate historical data does not become misleading even if . . . [the company might predict] less favorable results . . . in the future." *Ford*, 361 F.3d at 570. In *Ford*, the plaintiffs alleged that Ford had issued misleading statements because it knew that the company had sold SUVs with defective tires and that the eventual disclosure of that defect would adversely affect Ford's financial status. *Id.* The Court of Appeals held that "[b]ecause plaintiffs have not alleged the historical inaccuracy of Ford's financial and earnings' statements, such statements are not misrepresentations." *Id.* "It is clear that a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data . . . [it] does not become misleading even if less favorable results might be predictable by the company in the future." *In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 401, n.3 (6th Cir. 1997) (internal citations omitted).

In the instant matter, several of the statements that the class asserts are misleading cannot be misleading as a matter of law, because the statements are factually accurate and the class does not adequately allege they were untrue when said. For example, Defendant Sarvary noted, "Sales growth was strong [in 2011], both in the U.S. and overseas, and we have gained share domestically and around the world." (DE 91-15, p. 4). However, the class has not alleged that this is untrue. 2011 was a "record" year for TPX, and it would follow that in 2011 TPX had "strong growth" and "gained share." Even taking as true that iComfort was negatively affecting TPX's market and that iComfort would soon have a greater impact on TPX because it was expanding into other TPX retailers, such information does not make the statements Sarvary said about 2011 untrue or misleading in any way. As another example, Defendant Williams explained at a conference in March 2012, that

10

"[t]he Cloud has been phenomenally successful. It has been the primary driver of our growth over the last couple years . . . ." (DE 87, p. 36). While it is predominantly vague, this statement is not misleading because it accurately states historical facts that are not challenged by the facts the class alleges. In context, Williams was discussing the success of the Cloud over the last couple of years. The class simply has not alleged that the Cloud did not drive TPX's growth. That the iComfort was to compete with the Cloud does not make this statement untrue or misleading. In many instances, the class *does plead facts* in an attempt to show that the alleged statements are misleading; however, the facts alleged simply *do not* make the alleged statements misleading or untrue as a matter of law.

### ii. Material Omissions

Regarding omissions, materiality alone is insufficient to require disclosure. *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 706 (E.D. Mich, 2010). "Before liability for non-disclosure can attach, the defendant must have violated an affirmative duty of disclosure." *Sofamor*, 123 F.3d at 400. Further, "a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." *Albert*, 334 F. Supp. 2d at 1020. A duty to disclose may occur when there is insider trading, a statute requiring disclosure, or when there is "an inaccurate, incomplete or misleading prior disclosure." *Monroe*, 399 F.3d at 669. It is well settled that "we at least require an actor to provide complete and non-misleading information with respect to the subjects on which he undertakes to speak." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001). "The requirement to be complete and accurate, however, does not mean that 'by revealing one fact . . . one must reveal all others that, too, would be interesting . . . but means only such others, if any, that are needed so that what was

11

revealed would not be *so incomplete as to mislead.*'" *In re Bristol Myers Squibb Co., Sec. Litig.*, 586 F. Supp. 2d 148, 160 (S.D. N.Y. 2008) (emphasis added).

The class generally alleges that TPX should have disclosed information relating to TPX's competitor, Serta, and how the iComfort was impacting and could impact future sales. The class does not allege that TPX was under any affirmative duty to disclose the information it knew about the iComfort – only that statements made by TPX were misleading without the disclosure. The complaint is not specific on how much information TPX should have disclosed, but the complaint does allege that TPX knew or should have known the following pertinent information: iComfort had launched in 2011; in locations where it was competing with TPX, TPX sales were growing at a slower rate (the "2011 TPX Risk Analysis for iComfort Accounts" PowerPoint); that four of ten top TPX retailers would begin selling iComfort in 2012; that TPX was monitoring sales of TPX's "Top 30" retail accounts; and that therefore, TPX's projections for sales were inaccurate and were knowingly or recklessly untrue or misleading when said. (DE 87, p. 4, 26–27; DE 96, p.33). While such information may very well be material, the question is whether TPX was under a duty to disclose it.

TPX was under no duty to disclose this information while making the vast majority of the statements the class alleges are misleading, and to the extent such information should have been disclosed in the few statements about particular sales projections, TPX is protected by the safe harbor provision discussed below. Here, disclosure about the competition of iComfort and even any potential impact iComfort sales may have had on TPX or would have on TPX in the future were not necessary to make prior statements not misleading. *In re Time Warner Inc., Sec. Litig.*, 9 F.3d 259, 268 (2nd Cir. 1993) ("[O]ne circumstance creating a duty to disclose arises when disclosure is necessary to make prior

12

statements not misleading."). Even taking the complaint's facts as true, there is no connection between the alleged omitted information and the statements made by the individual defendants. To constitute an omission there must be a relationship between the omission and the statement itself, because it would be untenable not to have limits on the scopes of subjects. *Albert Fadem Trust v. Am. Elec. Power Co., Inc.*, 334 F. Supp. 2d 985, 1022–23 (S.D. Ohio 2004). In other words, a statement about competition or generally discussing competition does not trigger a duty for TPX to release the ins and outs of every known competitor and the impact that competitor is having or may have on TPX, so long as the omission of such information does not make the statements TPX *is making* misleading. "If a company speaks on a subject, notwithstanding a duty, it still is required to speak truthfully and to provide all information necessary to prevent its statements from being misleading." *Id.* Aside from TPX's very few statements regarding specific growth projections, the Court cannot find a single instance where, taken in context, the omission of the iComfort's impact or potential impact on TPX would make any of the alleged misleading statements actually misleading. Absent a duty to disclose, there is no material omission.

### iii. Scienter and the Safe Harbor Provision

Defendants argue (in the alternative) that any of the statements that are arguably misrepresentations or omissions fall under the safe harbor provision set forth in 15 U.S.C. § 78u-5. "The safe harbor was designed to encourage company disclosure of future plans and objectives by removing the threat of liability." *Helwig*, 251 F.3d at 559. The safe harbor provision of the PSLRA "provides that under certain circumstances a person or entity shall not be liable with respect to any written or oral forward-looking statements." *Humana*, 2009 WL 1767193 at *9; 15 U.S.C. § 78u-5(c)(1)&(2). Forward looking statements are defined broadly to include projections of revenue, income, earnings per share, or other

13

financial terms and statements of "future economic performance," including any such statement contained in a discussion and analysis of financial condition by management. 15 U.S.C. § 78u-5(i)(1); *see also Helwig*, 251 F.3d at 547–48 ("[T]his provision excuses liability for defendants' projections, statements of plans and objectives, and estimates of future economic performance."). Under the PSLRA, the safe harbor provision provides, "in any private action arising under this chapter that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading," a company or entity *shall not* be held liable with respect to any written or oral forward-looking statement to the extent that:

> (A) the forward-looking statement is—
>> (i) ***identified as a forward-looking statement, and is accompanied by meaningful cautionary statements*** identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
>> (ii) immaterial; or
>
> (B) the plaintiff fails to prove that the forward-looking statement
>> (i) if made by a natural person, was made with **actual knowledge** by that person that the statement was false or misleading; or
>> (ii) if made by a business entity; was—
>>> (I) made by or with the approval of an executive officer of that entity; and
>>> (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u-5(c)(1) (emphasis added); *Humana*, 2009 WL 1767193 at *9–10. Thus, the safe harbor provision provides two layers of protection. In the first prong, "if a forward-looking statement is accompanied by meaningful cautionary language, the issuer is *immune* from liability and *state of mind is irrelevant*." *Humana*, 2009 WL 1767193 at *10 (emphasis added); *Miller*, 346 F.3d at 672. Under the second prong, if the alleged misrepresentation

14

or omission is not accompanied by meaningful cautionary language, the plaintiff must allege specific facts giving rise to a *strong inference* that the statement was made with *actual knowledge* that it was misleading. *Id.* The Supreme Court has held, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.* 551 U.S. 308, 314 (2007).

The class maintains that the alleged forward-looking misstatements are not accompanied by meaningful cautionary language, but instead simply provide "boilerplate" language that is insufficient to be meaningful. "However, the PSLRA does not require companies to warn of the particular factor that ultimately causes the forward-looking statement not to come true in order to receive protection under the safe harbor provision." *Humana*, 2009 WL 1767193 at *12 (internal citations omitted); *see* H.R. Conf. Rep. No. 104-369 at 44 (1995). In most instances, TPX did warn of the particular factor the class pleads should have been disclosed; that is, TPX warns that its competitor Serta has a competing product, which could affect TPX sales. "In applying the bespeaks caution doctrine, we have noted that cautionary statements must be substantive and tailored to the specific future projections, estimates, or opinions . . . which the plaintiffs challenge." *Helwig*, 251 F.3d at 559 (internal citations omitted). TPX has met this standard. In a comparable case, a district court found that the defendant had not met the "meaningful cautionary language" standard because the language used by the defendant "implied that [a competitor's] development of competing software was a possibility as opposed to an actuality." *In re Compuware Sec. Litig.*, 301 F. Supp. 2d 672, 685 (E.D. Mich. 2004). The cautionary language TPX provided in its Form 10-K filings is adequate under the safe harbor provision

15

because it warns specifically of named competitors' viscoelastic products, not of the mere possibility of such competition.

Importantly, a company may incorporate by reference risk factors listed in other SEC filings, as TPX did in many instances as described below. *Miller*, 346 F.3d at 677–78; *Humana*, 2009 WL 1767193 at *13 (holding that forward-looking statements were immune from liability under the safe harbor provision, in part because press releases referred to other SEC filings that provided meaningful cautionary language). The Court will now address and describe the cautionary language provided during each set of alleged misrepresentations.

- **January 24, 2012 Press Release:** This release was accompanied by meaningful cautionary language, which stated, "This release contains 'forward-looking statements.' . . . All forward-looking statements are based upon current expectations and beliefs and various assumptions. There can be no assurance that the Company will realize these expectations or that these beliefs will prove correct . . . . There are a number of risks and uncertainties that could cause actual results to differ materially from the forward-looking statements contained in this release . . . [for example] industry conditions [and] industry competition." (DE 91-14, p. 7). Further, the form directed investors to TPX's Annual Report Form 10-K, which specifically indicated that "During the past several years, a number of our competitors, including Sealy, Serta and Simmons, have offered viscoelastic mattress and pillow products." (DE 91-4, p. 5).[2]

- **January 24, 2012 Conference Call:** As the transcript indicates, statements made by TPX were prefaced by the following language: "Forward-looking statements that we make during this call are made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995 . . . Actual results may differ due to a variety of factors . . . include[ing] . . . competitive . . . factors . . . [that] are also discussed in the company's SEC filings, including . . . [its] Form 10-K under the headings, Special Note Regarding Forward-Looking Statements and Risk Factors." (DE 91-15, p. 3). TPX's Annual Report Form 10-K, specifically noted, "During the past several years, a number of our competitors, including Sealy, Serta and Simmons, have offered viscoelastic mattress and pillow products." (DE 91-4, p. 5)

---

[2] Notably, the January 24, 2012 Press Release and the January 24, 2012 Conference Call both refer to the 2010 Annual Report 10-K, because the 2011 Report 10-K was not released until January 30, 2012.

- **January 30, 2011 Fiscal Year 2011 Form 10-K (Released January 30, 2012):** This form included meaningful cautionary language. The form stated, "This Annual Report . . . contains 'forward-looking statements' . . . which includes objectives, goals, strategies . . . future revenues or performance . . . . There are a number of risks and uncertainties that could cause our actual results to differ materially from the forward-looking statements contained in this report." (DE 91-8, p. i). "During the past several years, a number of our competitors, including Sealy, Serta, and Simmons, have offered viscoelastic mattress and pillow products, including several new prominent product introductions in 2011 . . . Any such competition by established manufacturers or new entrants into the market could have a material adverse effect on our business, financial condition and operating results." (DE 91-8, p. 5).

- **February 22, 2012 Investor Day Webcast:** This presentation was accompanied by the following meaningful cautionary language: "This presentation may contain 'forward-looking statements' . . . . There are a number of risks and uncertainties . . . [including] competition . . . Additional information concerning these and other risks . . . are discussed in the Company's . . . Form 10-K." (DE 91-16, p. 4). The 2011 Form 10-K notes specifically, "During the past several years, a number of our competitors, including Sealy, Serta, and Simmons, have offered viscoelastic mattress and pillow products, including several new prominent product introductions in 2011 . . . . Any such competition by established manufacturers or new entrants into the market could have a material adverse effect on our business, financial condition and operating results." (DE 91-8, p. 5).

- **March 5, 2012 Raymond James International Institutional Investors Conference:** This was a "condensed version" of the February 22nd Investor Day Webcast, which makes the above cautionary language. This "condensed version" also indicated "we may say something today that's forward-looking, so it's under the safe harbor provision." (DE 91-17, p. 2). As noted above, the Webcast directed listeners to the Form 10-K, which specifically provides cautionary language concerning Serta and "new prominent product introductions in 2011."[3]

- **April 19. 2012 Conference Call:** This call identified statements as forward-looking statements and cautioned that "[a]ctual results may differ due to a variety of factors . . . include[ing] competition . . . [which] are also discussed in the company's SEC filings, including the company's annual report on Form 10-K under the heading Special Note Regarding Forward-Looking Statements and Risk Factors." (DE 19-20, p. 3). As noted above, the 2011 Annual Report 10-K

---

[3] It is unclear whether these warnings were sufficient to constitute meaningful cautionary language. This Conference was a condensed version of an earlier webcast, and the webcast correctly directed investors to TPX's Form 10-K, which provides meaningful cautionary language. Thus, it is unclear whether such language can be incorporated through two layers of reference. However, as discussed in Part III. B *infra*, the statements made during the Raymond James International Institutional Investors conference are still protected by the safe harbor provision regardless of whether the cautionary language is meaningful.

notes specifically, "During the past several years, a number of our competitors, including Sealy, Serta, and Simmons, have offered viscoelastic mattress and pillow products, including several new prominent product introductions in 2011 . . . Any such competition by established manufacturers or new entrants into the market could have a material adverse effect on our business, financial condition and operating results." (DE 91-8, p. 5).

- **1Q 2012 Form 10-Q Quarterly Report:** This report provided the following meaningful cautionary language: "This quarterly report on Form 10-Q, including the information incorporated by reference herein, contains 'forward-looking statements' . . . . There are a number of risks and uncertainties that could cause our actual results to differ materially from the forward-looking statements contained in this report. Important factors that could cause our actual results to differ materially from those expressed as forward-looking statements are set forth in this report . . . and under the heading "Risk Factors" . . . of our Annual Report on Form 10-K, for the year ended December 31, 2011." (DE 91-9, p. 3). The Report continued to caution, "Additionally, we believe that a number of our significant competitors offer mattress products claimed to be similar to our TEMPUR® mattresses and pillows. Recently, there have been significant new competitive launches and aggressive price promotion in our industry, which is moving increadingly [sic] toward non-spring mattresses." (DE 91-9, p. 29). The Annual Form 10-K specifically refers to Serta by name as a competitor who has launched a competitive product in 2011. (DE 91-8, p. 5).

Finally, as to any statements of present or historical facts, the plaintiff must plead facts showing recklessness. *Miller*, 346 F.3d at 672. "Recklessness is defined as highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it." *Id.* (internal citations omitted).[4]

## B. EVALUATION OF STATEMENTS

The parties have devoted hundreds of pages of briefing to debating whether the class has pleaded an actionable claim under Section 10(b)/Rule 10b-5. Because of the sheer number of alleged misleading statements, the Court has determined that a list will best provide an analysis of each individual remark. The list is grouped by event; for example, all

---

[4] The Court will not address whether the class has adequately pleaded recklessness because in Part III. B *infra*, the Court has found that all such present or historical statements were either immaterial or not misleading as a matter of law.

statements made in the January 24, 2011 conference are listed together under that heading. The class seems to have taken the quantity over quality approach, as most of the statements fail on multiple and alternative grounds. Most of the statements, in whole or in part, are so vague, general, and non-specifically optimistic, that they are as immaterial as a matter of law. *Ford*, 381 F.3d at 570. The class also inadequately pleads that many of the statements are misleading because the facts as alleged do not make the historical or present statements false or misleading. *Sofamor*, 123 F.3d at 401, n.3. Some of the statements are also forward-looking statements, accompanied by cautionary language, and fall within the protection of the safe harbor provision.

### January 24, 2012 Press Release

- *"In 2011, we delivered strong financial performance, strengthened our competitiveness . . . ."* – *Sarvary.*

This is a vague and puffy statement that is immaterial as a matter of law. *Ford*, 381 F.3d at 570. It is "too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision." *Monroe*, 399 F.3d at 671; *see also In re Cable & Wireless, PLC*, 321 F. Supp. 2d 749, 767 (E.D. Va. 2004) (finding language about a "competitive advantage" was puffery). The class alleges this statement is untrue or misleading because TPX was facing competition from iComfort in 2011 that was beginning to have a negative effect on sales. (DE 87, p. 26–27). However, "[s]uch statements are either mere corporate puffery or hyperbole that a reasonable investor would not view as significantly changing the general gist of available information, and thus, are not material, even if they were misleading." *Ford*, 381 F.3d at 570. For example, in *Ford* the Court of Appeals held that statements such as "Ford is designing safety into . . . [its] cars and trucks . . ." and Ford is "taking across-the-board

actions to improve . . . [its] quality," were immaterial as a matter of law, even if they were misleading. *Id.* The same is true here. Further, even if the statement were material, it is an accurate statement of historical fact because it refers to 2011 growth. The class does not allege that TPX did not grow in 2011. Such accurate historical statements are not actionable as a matter of law. *See Ford*, 381 F.3d at 570.

### January 24, 2012 Conference Call

- *"Sales growth was strong, both in the U.S. and overseas, and we have gained share domestically and around the world." – Sarvary*

First, the statement "growth was strong" is the sort of vague and optimistic statement that is immaterial as a matter of law. *Ford*, 381 F.3d at 570. Second, the class has not adequately alleged that this is a misrepresentation. The class alleges that this statement was misleading because TPX knew the impact of the iComfort on TPX markets and that iComfort was soon to be launched at TPX's largest retailers. (DE 87, p. 31). However, this statement was made in relation to *2011 growth*, and the class does not allege that TPX did not gain share or have strong growth in 2011. In context, the class simply has not alleged that any of the facts the statement describes are untrue. "[T]he disclosure of accurate historical data does not become misleading even if . . . [the company might predict] less favorable results . . . in the future." *Ford*, 381 F.3d at 570.

- *"The new cloud collection continues to grow in the U.S." – Sarvary*

First, this is again vague puffery by an executive that is immaterial as a matter of law. *Ford*, 381 F.3d at 570; *Plumbers*, 778 F. Supp. 2d at 872 (dismissing similar general, optimistic statements). Alternatively, the class has not adequately alleged that this statement is a misrepresentation. While Plaintiffs have alleged that the TPX collection was facing competition and even grew slower in markets where that competition existed, it has

not alleged that the collection was not growing. In fact, according to the complaint, even in the mid-size retailers where TPX was competing with iComfort, TPX sales were still growing. (DE 87, p. 2–3).

- *"We currently expect net sales to range from $1.6 billion to $1.65 billion. And we currently expect earnings per share to range from $3.80 to $3.95 per diluted share. We project our gross margin for the full year to be up as much as 200 basis points at the high end of our guidance range and slightly less than this at the low end." – Williams.*

To the extent that this is a material misrepresentation or omission, it falls within the safe harbor provision. It is a forward-looking statement as defined by 15 U.S.C. § 78u-5(i)(1). Further, when "a forward-looking statement is accompanied by meaningful cautionary language, the issuer is immune from liability and state of mind is irrelevant." *Humana,* 2009 WL 1767193 at *10 (emphasis added); *Miller,* 346 F.3d at 672. This conference call was identified as including forward-looking statements that could change as result of a variety of factors disclosed in other SEC filings. The SEC filing Form 10-K specifically notes, "During the past several years, a number of our competitors, including Sealy, *Serta* and Simmons, have offered viscoelastic mattress and pillow products." (DE 91-4, p. 5); *see supra* Part III. A. iii. It therefore falls within the PSLRA safe harbor provision.

- *"And in the first quarter sales trends through the first 23 days have continued to be strong and we are very pleased with that." – Williams*

First, the entire statement represents vague corporate optimism that is immaterial as a matter of law. *Ford* 381 F.3d at 570. Alternatively, the class has not adequately pled that this is a misrepresentation, because it does not allege that the first quarter sales through the first 23 days were not "strong." Instead, the crux of the class's complaint is that TPX's specific projections of growth could not have been accurate due to iComfort competition, but this statement refers only to the growth-to-date. The class does not even allege that TPX

21

sales stopped growing or were "weak," as even in locations where TPX was competing with the iComfort, TPX sales continued to grow, albeit at a lower average rate than TPX sales where it was not competing with the iComfort. "The disclosure of accurate historical data does not become misleading even if . . . [the company might predict] less favorable results . . . in the future." *Ford*, 381 F.3d at 570.

- *"We think the U.S. will continue to perform." – Williams*

This statement is also immaterial, as it is clearly an instance of a TPX executive making a vague optimistic statement. *Ford*, 381 F.3d at 570. No reasonable investor could find this statement important to the total mix of information available. *Id.*

- *"In the fourth quarter we experienced improving growth rate month by month. And in the first quarter sales trends through the first 23 days have continued to be strong." – Williams*

The class has not adequately pled that this is a misrepresentation, because it does not allege that the fourth quarter sales were not strong, or that the first twenty-three days sales were not strong. "The disclosure of accurate historical data does not become misleading even if . . . [the company might predict] less favorable results . . . in the future." *Ford*, 381 F.3d at 570. Even taken as true, the class's complaint only alleges that TPX experienced competition that was challenging its growth, not that it made sales weak. According to the class, even in the few locations selling both TPX and iComfort mattresses, TPX sales were growing by 3%. (DE 87, p. 2–3; DE 96-5). Since omitting information about iComfort competition does not make this statement misleading, there is no material omission, and the class has not alleged any other duty to disclose.

- *"But we did see both domestically and internationally on the domestic side we saw improving trends in the business as the quarter went on . . . ." – Williams*

22

First, this constitutes the sort of corporate optimism that fails to communicate much at all. *Ford*, 381 F.3d at 570. The class alleges this statement is misleading without revealing the known impact of the iComfort and that the iComfort was about to be launched at more TPX retailers. However, alleging that iComfort was impacting TPX does not indicate that TPX did not see improving trends domestically. Thus, the class has not adequately pled that this statement is a misrepresentation or omission. Further, TPX was under no duty to disclose the future release of iComfort, as even if the company thought business may be negatively impacted in the future, it does not change the present truthfulness of the statement. "[T]he disclosure of accurate historical data does not become misleading even if . . . [the company might predict] less favorable results . . . in the future." *Ford*, 361 F.3d at 570.

- *"So this is what we anticipate. But, as you said, from our point of view we have grown quite nicely this year – this year in this quarter, and we have seen share gains throughout the period." – Sarvary*

"We have grown quite nicely" is vague puffery and is immaterial as a matter of law. *Ford*, 381 F.3d at 570. As for the remainder, the class does not allege that TPX did not see gains, only that the iComfort would be released in TPX's retailers and that iComfort, in the limited areas it was introduced, was affecting sales. While, statements that are literally true can mislead investors, the Court must ask "whether the facts alleged [including in the context the statements are made] are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Plumbers*, 778 F. Supp. 2d at 878. Here, in context, Sarvary even indicates that competitors have and will continue to make it a tough market. Further, the question that initiated this response was targeted at overall market growth of viscoelastic mattresses, not competition of companies offering viscoelastic mattresses. Finally, even if competition could eventually affect share gains, that does not

make a historically accurate statement, here that share gains occurred through the period, misleading. "It is clear that a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data . . . [it] does not become misleading even if less favorable results might be predictable by the company in the future." *In re Sofamor,* 123 F.3d at 401, n.3.

- *"So what we look to do is to capitalize on this fundamental trend by continuing to have products that are both genuinely differentiated and preferred by consumers. We are quite excited about the situation as it stands right now." – Sarvary*

This is another clear example of vague corporate optimism that is immaterial. *Ford,* 381 F.3d at 570. Here, this type of brand cheerleading is "numbingly familiar to the marketplace . . ." and "no reasonable investor could find them important to the total mix of information available." *Id.* at 570–71.

## January 30, 2011 Fiscal Year 2011 Form 10-K (Released January 30, 2012) signed by Sarvary and Williams

- *"We provide strong channel profits to our retailers and distributors which management believes will continue to provide an attractive model for our retailers and discourage them from carrying competing lower-priced products."*

First, much of this statement is the sort of general corporate optimism that is immaterial as a matter of law. *Ford,* 381 F3d at 570. Second, "we provide strong channel profits . . ." is not misleading, as the class has not alleged that TPX does not provide strong channel profits to its retailers. Finally, as to the statement "management believes we will continue . . ." it is a forward-looking statement of future plans or objectives. *Helwig,* 251 F.3d at 547–48 ("[T]his provision excuses liability for defendants' projections, statements of plans and objectives, and estimates of future economic performance."); 15 U.S.C. §78u-5(i)(1). Further, when "a forward-looking statement is accompanied by meaningful cautionary language, the issuer is immune from liability and state of mind is irrelevant." *Humana,*

2009 WL 1767193 at *10 (emphasis added); *Miller*, 346 F.3d at 672. The 2011 Form 10-K was accompanied by very explicit cautionary language, such as Serta has "offered viscoelastic mattress and pillow products, including several *new prominent product introductions in 2011.*" (DE 91-8, p. 5) (emphasis added). Thus, the safe harbor provision applies, and a claim based on this statement is not actionable as a matter of law. *See* Part III. A. iii *supra.*

- *"The TEMPUR-Cloud collection continues to be well-received by retailers."*

This statement is non-material, vague puffery, as a reasonable investor would not consider it important to the total mix of information. *Ford*, 381 F. 3d at 570. Alternatively, it is not misleading. The class indicates it is misleading because "Defendants knew . . . that iComfort was about to be launched at certain of Tempur-Pedic's largest retailers." (DE 87, p. 32). However, this does not make a historical fact untrue or misleading, and any future impact a competitor may have is not relevant as a matter of law. "It is clear that a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data . . . [it] does not become misleading even if less favorable results might be predictable by the company in the future." *Sofamor*, 123 F.3d at 401, n.3. Further, the class has never alleged that retailers did not want to sell TPX mattresses, or that they stopped or demonstrated a desire to stop selling TPX mattresses; the class has only alleged that retailers were beginning to sell the iComfort *in addition* to the TPX brand.

**February 22, 2012 Investor Day Webcast**

- *"[W]e're differentiated because we have a consumer preferred and [inaudible] product line. . . And finally, and perhaps most importantly, we're growing. We have been growing. And we're projected continued growing [sic]. And there are a variety of reasons why we're very confident in that growth. But fundamental to that in our most penetrated market, in the U.S., we still only have about 3% market share [inaudible]. So we have enormous potential left with us." – Sarvary*

This statement is not actionable as a matter of law for a variety of reasons. First, the statement sounds more like a locker-room speech than anything a reasonable investor would materially rely upon. *See Ford,* 381 F.3d at 570. Second, the class does not plead that TPX did not only have about 3% of the market or that TPX had not grown. Third, to the extent that any of the statement constitutes a projection of growth or plan to penetrate more of the market share, such statements are forward-looking and are protected by the safe harbor provision, as they were accompanied by meaningful cautionary language. *See* Part III. A. iii *supra.*

- *"We're established as the industry leader in this $20 billion growing market. We have a differentiated product line, a unique preferred product; and a strong brand, supported by ubiquitous advertising. And that's kind of what we expect on a go-forward basis, that they would be growing about the same rate." – Sarvary*

Again, the majority of this statement is quintessential corporate optimism and puffery that is immaterial as a matter of law. *Ford,* 381 F.3d at 570. Further, the statements of historical fact are not pleaded as untrue. "They would be growing about the same rate" is not actionable, because it is a forward-looking statement, identified as such, and accompanied by cautionary language that is covered under the safe harbor provision. *See supra* Part III. A. iii.

### March 5, 2012 Raymond James International Institutional Investors Conference

- *"Just a phenomenal year for the Company, very pleased with the performance and we look for that kind of growth opportunity to continue into the long-term future." – Williams*

This is an example of corporate optimism that is immaterial and not actionable as a matter of law. *Ford,* 381 F.3d at 570. Alternatively, to the extent it can be classified as material, the forward-looking portion of this statement concerning growth opportunity falls within the safe harbor provision. As noted in Part III. A. iii *supra,* the cautionary language made

26

at this conference is probably sufficient, as this conference was an extension of a previous investor day webcast, which adequately referred to the company's form 10-K and its cautionary language. Thus, the statement is not actionable as a matter of law, regardless of the speaker's state of mind.

However, even if the cautionary language was insufficient, the class has not adequately pleaded that Williams *knew* that this statement was false. There must be a strong inference (most plausible among competing inferences) that the statement was made with actual knowledge that it was misleading. *Miller*, 346 F.3d at 676. Here, the class has presented absolutely no evidence to indicate that Williams had such knowledge. The only fact the class pleads to indicate that Williams had any knowledge that his statements were misleading is that Williams sold shares of his TPX stock for a net profit of $4.3 million.[5] (DE 87, p. 54) However, the devil is in the details. The class fails to explain that Williams retained 85% of his stock, and when the price of TPX stock declined, he lost approximately $23.4 million. Thus, "to the extent plaintiffs rely [solely] on the volume and value of defendant['s] sales as a foundation for their scienter allegations, that reliance is misplaced." *Campbell*, 234 F. Supp. 2d at 686. Even if the cautionary language is insufficient to trigger the absolute protection of the first safe harbor provision, Williams and TPX are protected by the second prong of the safe harbor provision because the class has failed to plead facts to give rise to a strong inference that Williams knew the statement was false or misleading.

- *"2011 was a record year on every measure of the business and we're looking for continued growth." – Williams*

---

[5] The other facts the class asserts, such as the September 2011 "Risk Analysis" Report, are not connected to Williams at all. Alleging that Williams should have known of the report is insufficient to constitute knowledge. The class also alleges that Sarvary, Williams, and other TPX executives attended a Las Vegas trade show where "Sarvary, Anderson, and Colony" learned that four of ten top TPX retailers would begin selling the iComfort. However, the facts alleged do not even place Williams at the meeting where such information as revealed. In short, none of the facts alleged are sufficient to create a strong inference that Williams *knew* his statements were false or misleading.

This statement is also clear puffery that is immaterial and not actionable as a matter of law. *Ford*, 381 F. 3d at 570. Part of the statement is also an accurate statement of historical fact that taken in the context cannot be considered misleading as a matter of law. *Sofamor*, 123 F.3d at 401, n.3. Assuming "looking for continued *growth*" constitutes any type of growth projection, it falls within the safe harbor provision as explained above because the class has failed to plead anything that could demonstrate a strong inference of knowledge on the part of Williams that the statement was misleading when made.

- *"We continue to see good – a long runway of opportunity continuing to improve gross margins in the business." – Williams*

Again, this statement is so vague and general that it is immaterial and not actionable as a matter of law. *Ford*, 381 F.3d at 570. Alternatively, the class has not adequately pleaded that TPX was not improving gross margins in the business. Gross margins refer to the difference between the revenue and cost. The class's allegations that TPX was facing competition from iComfort and that TPX would face more competition in the future do not make this statement false or misleading.

- *"The Cloud has been phenomenally successful. It has been the primary driver of our growth over the last couple years. Our core business has grown and has grown faster than the market. But the Cloud is what has driven the hyper growth of the business over the last couple of years domestically." – Williams*

First, the statement that the Cloud has been "phenomenally successful" is vague and immaterial as a matter of law. *Ford*, 381 F.3d at 570. Next, the class has not alleged that the remainder of the statement is untrue so as to be misleading; nor is it misleading in context. The class alleges the statement is misleading because the Cloud was facing and faces iComfort competition. However, "[i]t is clear that a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data," here that the

28

Cloud drove growth over the last few years, and "[it] does not become misleading even if less favorable results might be predictable by the company in the future." *Sofamor*, 123 F.3d at 401, n.3.

## April 19, 2012 Conference Call

- *"significant new competitive launches" –Sarvary*

The class argues that this statement is misleading "without fully discussing iComfort by name and fully disclosing the known significant impact iComfort was having on Tempur-Pedic sales in the markets in which iComfort was introduced." First, this statement is not a misrepresentation or omission. If anything, it describes exactly what the class complains should have been disclosed. The statement is not untrue, nor does the class allege as such. Second, it is not an omission because by omitting that this statement is about iComfort in particular is not misleading. Omitting that TPX sales grew at a slower rate in locations that were also selling iComfort is not in the general scope of this statement, which does not in any way provide detail about TPX's competitors or those effects competitors may or may not have on TPX. Therefore, there was no duty to disclose such information.

- *"So there's no basis to change what our original plans were. . . We don't have the evidence and proof points yet, because most of the major initiatives for the program – for the year are just starting." – Williams*

This statement was made during a discussion about TPX's new mattress line, Simplicity, and the TPX international market. There is absolutely no reason that there would be any duty to disclose anything about iComfort during this disclosure about new TPX products or as a result of it. The statement is not misleading; nor has the class adequately alleged facts to make it misleading. When asking, "whether the facts alleged [including in the context the statements are made] are sufficient to support a reasonable belief as to the misleading

29

nature of the statement or omission," the answer here is clearly, no. *Plumbers*, 778 F.

Supp. 2d at 878.

- *"I mean, it is something that we've talked about for a long time. And it is happening something like we expected." – Sarvary*

This statement is not misleading. That TPX does not go into a discussion about iComfort as

a competitor does not make this statement misleading. This statement was made in regard

to acknowledging that competitors are joining the viscoelastic mattress market, but to say

"that is something we expected," i.e. that TPX expected that other competitors would join

the market, does not open the door to revealing exactly how those competitors may affect or

not affect TPX's business. There is simply again no duty to disclose here, as the omission

does not make the statement misleading.

## IQ 2012 Form 10-Q Quarterly Report Signed by Sarvary and Williams

- *"We provide strong channel profits to our retailers and distributors which management believes will continue to provide an attractive business model for our retailers and discourage them from carrying competing lower-priced products."*

*See* analysis *supra* at page 24.

### C. CLASS'S SECTION 20(a) CLAIM AGAINST INDIVIDUAL DEFENDANTS

Liability under Section 20(a) is contingent on the class's ability to prove a primary

violation under Section 10(b)/Rule 10b-5. *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 696

(6th Cir. 2004); *Humana*, 2009 WL 1767193 at *17. Thus, since the class fails to plead an

actionable claim under Section 10(b), the class's claim under Section 20(a) fails as a matter

of law.

### D. CLASS'S ALTERNATIVE MOTION TO AMEND

As an alternative to asking the Court to deny Defendants' motion to dismiss, the

class moves to amend its complaint. (DE 97). However, the class did so "solely to add two

sentences and attach the documents." (DE 97, p. 2). As the class correctly noted, the Court can already consider the documents that the class seeks to attach in an amended complaint. (DE 97, p. 1). Thus, allowing the class to amend its complaint solely to add documents this Court has already considered would be futile because "the proposed amendment would not permit the complaint to survive a motion to dismiss." *Miller v. Calhoun Cnty.*, 408 F.3d 803, 817 (6th Cir. 2005). A court need not grant leave to amend under Rule 15 if the amendment would be futile. *Id.*; *see also Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 519 (6th Cir. 2010) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Moreover, the Sixth Circuit has indicated, "it is correct to interpret the PSLRA as restricting the ability of plaintiffs to amend their complaint, and thus as limiting the scope of Rule 15(a) of the Federal Rules of Civil Procedure." *Miller*, 346 F.3d at 692. "[T]he purpose of the PSLRA would be frustrated if district courts were required to allow repeated amendments to complaints filed under the PSLRA." *Id.* Thus, in addition to being futile, allowing the class to amend the complaint a second time would frustrate the purposes of the PSLRA.

## IV. CONCLUSION

Accordingly, as indicated in the Court's previous Order (DE 115) this matter is dismissed, and a judgment will be entered contemporaneously with this memorandum opinion.

This 23rd day of May, 2014.



Signed By:
*Karen K. Caldwell*
United States Distri...

31